IN THE DISTRICT COURT OF THE UNITED STATES
FOR THE MIDDLE DISTRICT OF ALABAMA
SOUTHERN DIVISION

| | | |
|---|---|---|
| MACKIE SHAY CHESHIRE, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | CIVIL ACTION NO. 1:12cv1113-CSC |
| | ) | (WO) |
| CAROLYN W. COLVIN, | ) | |
| Acting Commissioner of Social Security, | ) | |
| | ) | |
| Defendant. | ) | |

**MEMORANDUM OPINION**

**I.  Introduction**

The plaintiff applied for supplemental security income benefits under Title XVI of the

Social Security Act, 42 U.S.C. § 1381, *et seq*., alleging that she was unable to work because

of a disability.  Her application was denied at the initial administrative level.  The plaintiff

then requested and received a hearing before an Administrative Law Judge ("ALJ").

Following the hearing, the ALJ also denied the claim.  The Appeals Council rejected a

subsequent request for review.  The ALJ's decision consequently became the final decision

of the Commissioner of Social Security (Commissioner).[1]  *See Chester v. Bowen*, 792 F.2d

129, 131 (11th Cir. 1986).  The case is now before the court for review pursuant to 42 U.S.C.

§§ 405(g) and 1383(c)(3).  The parties have consented to the United States Magistrate Judge

conducting all proceedings in this case and ordering the entry of final judgment, pursuant to

---

[1] Pursuant to the Social Security Independence and Program Improvements Act of 1994, Pub.L. No. 103-296, 108 Stat. 1464, the functions of the Secretary of Health and Human Services with respect to Social Security matters were transferred to the Commissioner of Social Security.

28 U.S.C. § 636(c)(1) and M.D. Ala. LR 73.1.  Based on the court's review of the record in this case and the briefs of the parties, the court concludes that the decision of the Commissioner should be remanded for further proceedings.

## II.  Standard of Review

Under 42 U.S.C. § 423(d)(1)(A), a person is entitled to disability benefits when the person is unable to

> engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months . . .

To make this determination,[2] the Commissioner employs a five-step, sequential evaluation process.  *See* 20 C.F.R. §§ 404.1520, 416.920.

> (1)    Is the person presently unemployed?
> (2)    Is the person's impairment severe?
> (3)    Does the person's impairment meet or equal one of the specific impairments set forth in 20 C.F.R. Pt. 404, Subpt. P, App. 1?
> (4)    Is the person unable to perform his or her former occupation?
> (5)    Is the person unable to perform any other work within the economy?
>
> An affirmative answer to any of the above questions leads either to the next question, or, on steps three and five, to a finding of disability.  A negative answer to any question, other than step three, leads to a determination of "not disabled."

*McDaniel v. Bowen*, 800 F.2d 1026, 1030 (11th Cir. 1986).

The standard of review of the Commissioner's decision is a limited one.  This court

---

[2] A "physical or mental impairment" is one resulting from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques.

must find the Commissioner's decision conclusive if it is supported by substantial evidence. 42 U.S.C. § 405(g); *Dyer v. Barnhart,* 395 F.3d 1206, 1210 (11th Cir. 2005). Substantial evidence is "more than a scintilla," but less than a preponderance; it "is such relevant evidence as a reasonable person would accept as adequate to support a conclusion." *Crawford v. Comm'r of Soc. Sec.*, 363 F.3d 1155, 1158-59 (11th Cir. 2004) (quotation marks omitted).  The court "may not decide the facts anew, reweigh the evidence, or substitute . . . [its] judgment for that of the [Commissioner]." *Phillips v. Barnhart*, 357 F.3d 1232, 1240 n. 8 (11th Cir. 2004) (alteration in original) (quotation marks omitted).

> [The court must] . . . scrutinize the record in its entirety to determine the reasonableness of the [Commissioner's] . . . factual findings . . . No similar presumption of validity attaches to the [Commissioner's] . . . legal conclusions, including determination of the proper standards to be applied in evaluating claims.

*Walker v. Bowen*, 826 F.2d 996, 999 (11th Cir. 1987).

### III.  The Issues

**A.  Introduction**.  The plaintiff was 31 years old at the time of the hearing before the ALJ.  (R. 40).  She has her general equivalency diploma (GED) and a certificate in fashion production.  (*Id*.).  She has no relevant past work experience.  (R. 28).  Following the hearing, the ALJ concluded that the plaintiff has severe impairments of " bipolar disorder, depression, schizoaffective disorder, personality disorder, s/p gastric perforation and repair, lumbar radiculopathy, s/p amputation injury to the 4th and 5th digits on the left hand, history of substance abuse, not material and in reported remission and left upper extremity carpal

tunnel syndrome (20 CFR 416.920(c))." (R. 21). Using the Medical-Vocational Guidelines, 20 C.F.R. Pt. 404, Subpt. P., App. 2, as a framework and relying on the testimony of a vocational expert, she concluded that there were significant number of jobs in the national economy that the plaintiff could perform. (R. 29). Thus, the ALJ concluded that the plaintiff was not disabled. (*Id*.).

**B. Plaintiff's Claim**. The plaintiff presents the following issue for the Court's review. As stated by Cheshire, the issue is whether "[t]he Commissioner's decision should be reversed because the ALJ erred in failing to give proper weight to the opinion of Reginald Walker, Ms. Cheshire's treating mental health therapist and William T. Wright, clinical director." (Doc. # 14, Pl's Br. at 4).

## IV. Discussion

This court's ultimate inquiry is whether the Commissioner's disability decision is supported by the proper legal standards and by substantial evidence. *See Bridges v. Bowen*, 815 F.2d 622 (11th Cir. 1987). However, the court pretermits discussion of the plaintiff's specific arguments because the court concludes that the ALJ erred as a matter of law when she failed to fully develop the record.

While a claimant has the burden of proving that she is disabled, an ALJ has a basic duty to develop a full and fair record. *Ellison v. Barnhart*, 355 F.3d 1272, 1276 (11th Cir. 2003). "Social Security proceedings are inquisitorial rather than adversarial. It is the ALJ's duty to investigate the facts and develop the arguments both for and against granting

4

benefits." *Sims v. Apfel*, 530 U.S. 103, 110-111 (2000).

> The SSA is perhaps the best example of an agency that is not based to a significant extent on the judicial model of decisionmaking. It has replaced normal adversary procedure with an investigatory model, where it is the duty of the ALJ to investigate the facts and develop the arguments both for and against granting benefits; review by the Appeals Council is similarly broad. *Id*. The regulations also make the nature of the SSA proceedings quite clear. They expressly provide that the SSA "conducts the administrative review process in an informal, nonadversary manner." 20 C.F.R. § 404.900(b).

*Crawford & Co. v. Apfel*, 235 F.3d 1298, 1304 (11th Cir. 2000).

An administrative law judge has a duty to develop a full and fair record. *Kelley v. Heckler,* 761 F.2d 1538 (11th Cir. 1985). The ALJ is not free to simply ignore medical evidence, nor may she pick and choose between the records selecting those portions which support her ultimate conclusion without articulating specific, well supported reasons for crediting some evidence while discrediting other evidence. *Marbury v. Sullivan*, 957 F.2d 837, 839-41 (11th Cir. 1992). When there is a conflict, inconsistency or ambiguity in the record, the ALJ has an obligation to resolve the conflict, giving specific reasons supported by the evidence as to why she accepted or rejected one opinion or record over another. "In the absence of such a statement, it is impossible for a reviewing court to determine whether the ultimate decision on the merits is rational and supported by substantial evidence." *Cowart v. Schweiker,* 662 F.2d 731, 735 (11th Cir. 1981).[3] "Failure to do so requires the case be vacated and remanded for the proper consideration." *Hudson v. Heckler,* 755 F.2d 781,

---

[3] *See Bonner v. City of Prichard*, 661 F.2d 1206 (11th Cir. 1981) (*en banc*), adopting as binding precedent all of the decisions of the former Fifth Circuit handed down prior to the close of business on September 30, 1981.

785 (11th Cir. 1985).

As will be explained, the court concludes that the ALJ failed to fully and fairly develop the record concerning the plaintiff's mental impairments.  It is undisputed that Cheshire has been diagnosed with bipolar disorder, schizophrenia, multiple personality disorder, and anxiety.  (R. 464, 458, 216, 476, 491, 677, 680-81, 690).   During the administrative hearing, Cheshire testified that she hallucinates "all the time . . . [e]ven with [her] medicine." (R. 41).  She also suffers from anxiety and claustrophobia.  (*Id.*).  Cheshire testified that she took her medicine as prescribed and that her symptoms improved but she still hallucinated.  (R. 44).  Cheshire testified that she has been on psychotropic medication since she was twelve (12) years old.  (R. 45).  Thus, the plaintiff clearly suffers from mental illness.  What is not plain is the extent or effect of her mental impairments on her ability to work.

Cheshire has received mental health treatment from the South Central Alabama Mental Health Clinic for several years.  Treatment notes reveal the following.  On June 3, 2009, Cheshire presented to the mental health clinic requesting treatment for bipolar disorder and multiple personality disorder.  (R. 476).  She was recently released from prison and she was out of her Zyprexa[4] and Trazadone[5] medications.  (R. 476, 478).  On June 30, 2009, a mental status examination indicated that Cheshire was experiencing visual, tactile and

---

[4]  Zyprexa is a medication used to treat schizophrenia and bipolar disorder.

[5]  Trazadone is a medication used to treat depression.

gustatory hallucinations. (R. 484). She also reported receiving messages directly from God. (R. 485, 487). It was noted that she had "Markedly Impaired Attention/Concentration," "Markedly Impaired Judgment," "Explosive Temper/Anger Outbursts," "Extreme Impulsivity," and "Limited Work Skills or Medical Problems Prevent Independence." (R. 488). She was referred to the psychiatrist and an therapist for continued treatment. (R. 490). She was diagnosed with bipolar disorder and personality disorder. (R. 491). Her GAF score was assessed at 30.[6]

On July 15, 2009, Cheshire was experiencing hallucinations and had "below average judgment. (R. 504). She was prescribed Zyprexa and Trazadone. (R. 504, 496). On July 21, 2009, Cheshire participated in group therapy. (R. 503). Her GAF score was assessed at 31, and her risk level was 2 (low). (*Id.*)

On August 6, 2009, Cheshire participated in individual therapy and there is no indication she was experiencing hallucinations. (R. 502). She was prescribed Zyprexa and her GAF score was 30. Her risk level increased from level 2 (low) to 3 (moderate). *Compare* R. 502 to R. 503.

On August 27, 2009, Cheshire's treating psychiatrist, Dr. Lorna Bland, noted that the

---

[6] The Global Assessment Functioning Scale considers the psychological, social, and occupational functioning of an individual suffering from mental illness. While the Commissioner has declined to endorse the GAF scale for "use in the Social Security and SSI disability programs," and has indicated that GAF scores have no "direct correlation to the severity requirements of the mental disorders listings.," *see* 65 Fed.Reg. 50746, 50764-65 (Aug. 21, 2000), the score is "useful in planning treatment" and tracking an individual's rehabilitative progress. *See American Psychiatric Association: Diagnostic and Statistical Manual of Mental Disorders*, 30 (4th ed. 1994). A score of between 31 and 40 indicates "[s]ome impairment in reality testing or communication . . . OR major impairment in several areas, such as work or school, family relations, judgment, thinking or mood." (*Id*. at 32).

Trazadone was helping Cheshire sleep.  (R. 501).  Dr. Bland also renewed Cheshire's prescription for Zyprexa.  (*Id*.)  On September 3, 2009, Cheshire was not hallucinating, her GAF had increased to 36, and her risk level was back down to 2 (low).  (R. 500).  On September 24, 2009, Dr. Bland noted Cheshire's behavior was normal and her affect was appropriate.  (R. 499).  She "was doing very well."  (*Id*.) Dr. Bland continued Cheshire on her medications.  (*Id.*).

On November 2, 2009, Cheshire participated in individual therapy.  Her progress was described as "minimal" and her risk assessment was 3 (moderate).[7]  (R. 498).  On November 5, 2009, Cheshire was referred to Dr. Bland because she had recently been hospitalized.  (R. 507).  According to Cheshire, she had a migraine headache and she went to the emergency room.  (*Id*.)  She was given medication for her headache, but she became incoherent and was admitted for "Zyprexa overdose."  (*Id*.)  She stated that she did not "take more pills that [she] was supposed to," and that she felt "fine."  (*Id*.)  She had not taken Zyprexa for three (3) days, and she had been overtaking her Trazadone.  (*Id*.).  Dr. Bland prescribed both Zyprexa and Trazadone.  (*Id*.)

On November 18, 2009, Dr. Bland noted that Cheshire had recently overdosed on her Zyprexa medication.  (R. 508, 698).  Dr. Bland prescribed Cheshire Geodon[8] instead of Zyprexa and continued her on Trazadone.  (R. 508).

_____

[7]  No GAF score was noted.  (R. 498).

[8]  Geodon is a pyschotropic medication used to treat schizophrenia and bipolar disorder.

On January 11, 2010, Cheshire participated in group therapy.  Her progress was described as minimal and she asked to see the psychiatrist.  (R. 509, 697).  Her GAF score was assessed at 36 and her risk level was 2.  (*Id*.)

On February 3, 2010, Dr. Bland again diagnosed Cheshire with bipolar disorder.  (R. 510, 696).  She noted that the Geodon medication caused Cheshire to have muscle spasms, shake and bite her lips.  (*Id*.)  Cheshire was not doing well because her medications had been stopped for one month.  (*Id*.)  Dr. Bland prescribed Abilify[9] and continued Cheshire on Trazadone.  (*Id*.)  On February 24, 2010, Cheshire was in an irritable mood, and she reported taking only Trazadone.  (R. 511, 695).  The treatment note indicates that Cheshire was compliant with her medication, but that she was going to be prescribed Abilify.  (*Id*.).  Her GAF score was 36 and her risk level was 2 (low).  (*Id*.)

On April 25, 2010, Cheshire was admitted to the Enterprise Medical Center suffering from a salicylate overdose.  (R. 216-456).

> In brief, a 30-year old female that evidently took a large amount of salicylate. Presented to emergency room.  Patient required intubation.  Was ventilated for several days and treated for the salicylate overdose.  Was eventually extubated. . . . is doing well medically.  **Unfortunately is having marked problems with personality and confusion.**  This is her biggest problem.  She is beginning to eat.  Medically is doing well.  **However, having severe psychiatric problems that are going to require more intensive treatment**.
>
> At this time it is felt patient is stable for transfer to a psychiatric facility.  She is currently receiving Abilify 5 mg in the morning 10 at night. . . . has been receiving Xanax on a p.r.n. basis. . . . **Has basically had to be in 4-point**

---

[9] Abilify is another psychotropic drug used to treat schizophrenia and bipolar disorder.

**restraints because of the confusion, personality disorder**.

(R. 216) (emphasis added).

Prior to her discharge from Enterprise Medical Center, it was recommended that Cheshire be transferred to a psychiatric facility.  (R. 217).  Her dosage of Abilify was increased in an effort to control her behavior. (R. 218).  On April 30, 2010, a nurse's note indicates that Cheshire was disoriented and belligerent.  (R. 282).  She had to be restrained. (*Id*.)  By order of the court, Cheshire was transferred to the Crenshaw County Hospital for mental health treatment.  (R. 456, 458, 680-82, 694).

Upon her arrival at Crenshaw County Hospital, Cheshire was started on Abilify and Trazadone.  (R. 458-474).  Her GAF score was 10 and her risk level was 4 (high).  (R. 694). On May 3, 2010, the dosage of her Abilify was increased, and on May 5, 2010, she was also prescribed Cogentin.  (*Id*.) She was diagnosed with schizophrenia, paranoid type, and chronic mental illness.  (*Id*.)  Her GAF score on discharge with 55 - 60.  She was discharged to outpatient treatment on May 10, 2010, and seen by the mental health clinic on that date.  (R. 693). She was given prescriptions for Abilify, Trazodone, and Cogentin.  (*Id*.).  Her GAF score was 21 and her risk level was 3.[10]  (*Id*.)

Cheshire participated in group therapy on May 13, 2010.  At that time she "was not doing well, verbal but friagile (sic)."  (R. 691).  She was referred to Dr. Bland.  (*Id*.)  Her

---

[10]  There is no explanation in the record of the discrepancy between Cheshire's GAF score of 55-60 upon her discharge from Chenshaw County Hospital and her GAF score of 21 at the South Central Mental Health Cline later that same day.

GAF score was 25 and her risk level was 3.  (R. 691-92).

In early June 2010, Cheshire was also hospitalized for a perforated gastric ulcer.  (R. 516-632).  During her hospitalization, she was prescribed Abilify and Trazadone (R. 595-97,628).  She was also prescribed Cogentin.[11]  (R. 595).

Dr. Bland saw Cheshire on June 30, 2010.  (R. 690).  At that time, Dr. Bland decreased Cheshire's Abilify dosage, added Vistarel, continued her on Trazadone and discontinued the Cogentin.  (*Id*.)

On July 13, 2010, Cheshire participated in group therapy.  She was compliant with her medication, her GAF score was 34, and her risk level was 2.  (R. 688-89).

On September 3, 2010, Cheshire's annual assessment was completed by the South Central Alabama Mental Health Clinic. (R. 667-76).  She was easily distracted and she had inappropriate loose associations in her thoughts.  (R. 668).  She was also experiencing tactile hallucinations.  (*Id*).  Although Cheshire admitted to suicidal thoughts, she maintained that the overdose in April was accidental.  (R.668-69).   Noted clinical symptoms included auditory and tactile hallucinations, manic episodes, extreme impulsivity, impaired attention, markedly impaired judgment, flights of ideas, racing thoughts, and social anxiety.  (R. 669).  At that time, it was noted that Cheshire was unemployable due to her symptoms.  (*Id*.)  It was also noted that Cheshire could not live alone.  (R. 676).

Cheshire was provided her treatment plan and prescriptions. (R. 687).  Her GAF score

---

[11]  Cogentin is used to treat symptoms of Parkinson's disease.

was 36 and her risk level was 2 (low).  (*Id.*)  There was also an unexplained notation of "non-compliant" with medication, although Cheshire received her prescriptions on this date.  (*Id.*)

On November 10, 2010, Cheshire presented to the mental health clinic to receive her prescriptions.  (R. 685).  Her GAF score was 35 and her risk level was 3 (moderate).  (*Id.*)

On December 9, 2010, Dr. Bland diagnosed Cheshire with schizophrenia and anxiety disorder.  (R. 677).  Her current GAF score was 30.  (*Id.*)

On January 7, 2011, a treatment note indicated that Cheshire was non-compliant with her medication.  However, the same note indicates that Cheshire was specifically seen to receive medication.  (R. 684).  Her GAF score was 35 and her risk level was 2.  (*Id.*)

On May 24, 2010, Reginald Walker, Cheshire's therapist, completed a medical source statement assessing Cheshire's mental impairments.  (R. 512-14).  According to Walker, Cheshire has extreme limitations in fifteen areas dealing with her ability to function in a work environment.  (*Id.*)  She has marked restrictions in  one area, moderate restrictions in one area, and none of her restrictions are   mild.  (*Id.*)  According to Walker, Cheshire's impairments would be expected to last more than 12 months.  (R. 514).  Walker also commented that "consumer has poor ability to maintain employment." (*Id.*) William Wright, the clinical director, signed off on the assessment.  (*Id.*)

After reviewing the medical evidence, the ALJ acknowledged Walker's opinion on the assessment but discounted it because "he is not an acceptable medical source, . . . [and] Walker's assessment conflict (sic) with his own treatment notes."  (R. 27).  The ALJ noted

that Cheshire had received mental health treatment but noted "a strong history of noncompliance with medication regimen and counseling." (R. 25).

> The Administrative Law Judge recognizes that the claimant was hospitalized on April 25, 2010, after overdosing on salicylate.  She notes that once the claimant's condition stabilized, she was transferred for treatment at a psychiatric facility.   The Administrative Law Judge finds it extremely significant that the claimant reported that the overdose was accidental and denied feeling depressed or anhedonic.  The doctor noted the claimant was alert and oriented times three.  Her thoughts were fairly organized and insight and judgment were fair.  The records reveal the claimant received outpatient counseling through South Central Mental Health.  The Administrative Law Judge finds it extremely significant that the doctor noted a strong history of noncompliance.  She notes that the therapist found the claimant's risk level was two.   The Administrative Law Judge recognizes that the therapist completed a mental residual functional capacity on which he indicated the claimant has marked and extreme limitations in most areas of functioning. The Administrative Law Judge does not give significant weight to Mr. Walker's opinion because he is not an acceptable medical source.  The Administrative Law Judge notes that Dr. Walker's[12] assessment conflict with his own treatment notes.  Specifically, the medical evidence documents that when the claimant is compliant with medication and treatment her mental health symptoms improve.  The Administrative Law Judge finds that if the claimant's restrictions were as those identified in the report from May 2010, the claimant would have been hospitalized as before.  The Administrative Law Judge notes that recent therapy notes reference normal thought processes, appropriate affect and compliance with medication (Exhibit 12-F).

> Nothing in the record suggests that the claimant's physical and/or mental impairments have been incapable of being alleviated or controlled with proper and regular use of prescription and/or over-the-counter medications.  In fact, the record discloses that such medications have proven successful in assisting the claimant in maintaining control of her conditions and mitigating any accompanying symptomatology.  As stated above, the evidence indicates a strong history of noncompliance with treatment and medication.

---

[12]  The Administrative Law Judge refers to Walker as Mr. and Dr.  (R. 27).  It is clear that the reference to Walker as a doctor is simply a scrivener's error.

13

(R. 27) (footnote added).

The first problem the court encounters with the ALJ's determination is it is unable to ascertain the evidence upon which the ALJ relied to determine that Cheshire has "a strong history of noncompliance with treatment and medication." (R. 25, 27). The ALJ does not provide references to the medical evidence to support her conclusions. The court has scoured the 727 page administrative record and found only three notations of non-compliance – January 7, 2011, September 30, 2010, and January 11, 2010. (R. 684, 687, 697). On two of those occasions, Cheshire received her medications on the date it was noted she was non-compliant. (R. 684, 687). On May 7, 2010, it was noted that Cheshire was "not taking her medications correctly" which indicates she was taking the medications, just not taking them properly. (R. 681). There is only one notation in the entire record that Cheshire failed to appear for an appointment on October 19, 2010. (R. 686) Finally, the ALJ ignores multiple notations that Cheshire was compliant with her medications but was still experiencing difficulties or was making minimal progress. (R. 498, 500, 511, 688 and 695).

Furthermore, a review of the medical records clearly demonstrates that the ALJ culled the record for selective references, ignoring comments that did not support her conclusions. The ALJ relied on the report of the non-consultative state agency physician, Dr. Koulianos, to determine that Cheshire is not disabled. (R.23, 27). On September 8, 2009, Dr. Koulianos opined that Cheshire's mental impairments caused only mild or moderate limitations in her functional activities. (R. 179-91)

14

Supporting the Administrative Law Judge's finding that the claimant is not disabled are the reports from the State Agency psychiatrist. Dr. Koulianos found the claimant has only mild to moderate restrictions. She noted the claimant demonstrates the ability to shop, pay the bills, count change and handle a checking and savings account.

(R. 27).

The ALJ's reliance on Dr. Koulianos is misplaced because Dr. Koulianos' opinion predates Cheshire's significant treatment history since September 2009. Cheshire presented to the Mental Health Clinic upon her release from prison to secure treatment and medication. (R. 476, 478). She regularly sought treatment, participated in therapy and took her medication but still experienced hallucinations, anxiety, and poor judgment. (R. 484, 488, 504, 503, 498, 508-11, 690-91, 687-89). Her GAF score was consistently between 25 and 36 even though she was taking her medications. (R. 491, 500, 503, 509, 511, 691-92, 687-89, 684-85). Although the ALJ acknowledged that Cheshire's April 2010 hospitalization for an "accidental overdose" of salicylate, (R. 27), she ignores evidence that indicates that Cheshire was experiencing "severe psychiatric problems" during her hospitalization.[13] (R. 216). During her hospitalization, Cheshire was restrained in "4-point restraints because of the confusion, personality disorder." (*Id*.) The ALJ ignores evidence that Cheshire was court-ordered into a psychiatric facility. (R. 456, 458, 680-82, 694).

The ALJ also makes no mention of Cheshire's November 2009 hospitalization for

---

[13]     The court notes that Dr. Koulianos' opinion was rendered before this hospitalization. Interestingly, Dr. Koulianos notes that Cheshire had experienced no episodes of decompensation.

a Zyprexa overdose.[14]   (R. 507-08).   Finally, the ALJ completely ignores Cheshire's

September 3, 2010, annual assessment from the South Central Mental Health Clinic in which

it was noted that she was easily distracted, had inappropriate loose associations in her

thoughts, and was experiencing auditory and tactile hallucinations, manic episodes, extreme

impulsivity, impaired attention, markedly impaired judgment, flights of ideas, racing

thoughts, and social anxiety.  (R. 668-69)  The ALJ makes no mention of the notations that

Cheshire was unemployable due to her symptoms, and that she could not live alone.  (R. 668-

69, 676).

       Not only did the ALJ fail to consider all of Cheshire's mental health records, she then

compounded her error by failing to secure a consultative psychological examination for

Cheshire.   There is sufficient evidence in the record from which the ALJ should have

concluded that it was necessary to secure additional evidence regarding the plaintiff's mental

impairments before rendering a decision regarding her disability.   While the ALJ ordered a

physical consultative examination for Cheshire, she inexplicably failed to order a

psychological consultative examination.  Where a consultative evaluation is needed to make

an informed decision, it is error for an ALJ not to order such an evaluation.  *Reeves v.

Heckler*, 734 F.2d 519 (11th Cir. 1984).  By failing to refer Cheshire for a consultative

psychological examination, the ALJ improperly substituted her judgment for that of a

psychologist with respect to the question of the severity of Cheshire's mental impairments.

_____

       [14]   This hospitalization also occurred after Dr. Koulianos rendered her assessment of Cheshire's
limitations.

Under the circumstances of this case, the court concludes that there was sufficient information before the ALJ to require her to obtain a psychiatric or psychological evaluation about Cheshire's mental impairments so she could make an informed decision. "[I]n any case where there is evidence which indicates the existence of a mental impairment the . . . [Commissioner] may determine that the claimant is not disabled *only if* the . . . [Commissioner] has made every reasonable effort to obtain the opinion of a qualified psychiatrist or psychologist." *McCall v. Bowen*, 846 F.2d 1317, 1320 (11th Cir. 1988). The ALJ may not substitute her judgment for the judgments of experts in their field of expertise. Psychiatrists deal with quintessentially subjective information with respect to which they must exercise professional, interpretive judgment. "'Even a "mild" mental impairment may "prevent [a] claimant from engaging in the full range of jobs contemplated by the exertional category for which the claimant otherwise qualifies.'" *Allen v. Sullivan*, 880 F.2d 1200, 1202 (11th Cir. 1989). The medical evidence in this case suggests that Cheshire's mental impairments are far from mild.

Finally, the court pretermits discussion of Cheshire's argument that the ALJ improperly rejected the opinion of her therapist because the court concludes that the ALJ erred as a matter of law when she failed to consider the opinion of Cheshire's treating psychiatrist, Dr. Lorna Bland. While the ALJ discredits the plaintiff's treating therapist, Reginald Walker, the ALJ completely ignores Cheshire's treating psychiatrist, Dr. Lorna Bland. The medical records demonstrate that Dr. Bland treated Cheshire on July 15, 2009,

17

August 27, 2009, September 24, 2009, November 5, 2009, November 18, 2009, February 3, 2010, June 30, 2010, and December 9, 2010.  (R. 501, 499, 507, 508, 510, 677, 690, 696, 698).

On July 15, 2009, Dr. Bland diagnosed Cheshire with personality disorder and prescribed Zyprexa and Trazadone for her.  (R. 504).  Dr. Bland saw Cheshire on August 27, 2009, and continued her on her medications.  (R. 501).  On September 24, 2009, Dr. Bland opined that Cheshire's progress towards treatment goals was fair, and extended her treatment for 180 days.  (R. 499).  Dr. Bland saw Cheshire on November 5, 2009 to discuss her recent hospitalization due to an overdose of Zyprexa.  (R. 507).  Dr. Bland prescribed Zyprexa and Trazadone.  (*Id*.)  On November 18, 2009, Dr. Bland saw Cheshire and discontinued her Zyprexa and started her on Geodon instead.  She also maintained Cheshire on Trazadone.  (R. 508, 698).  On February 3, 2010, Dr. Bland noted that Cheshire was having adverse reactions to the medication Geodon, so she started Cheshire on Abilify.  (R. 510).  Dr. Bland noted that Cheshire's progress was poor and extended her treatment another 180 days.  (R. 510, 696).  On June 30, 2010, Dr. Bland noted that Cheshire's judgment and insight was below average and her impulse control was fair.  (R. 690).  Cheshire discussed her recent hospitalization for the salicylate overdose.  (*Id*.)  Dr. Bland diagnosed bipolar disorder, decreased the dosage of her Abilify, added Vistaril, discontinued Cogentin, and continued her on Trazadone.  (R. 690).On December 9, 2010, Dr. Bland diagnosed Cheshire as suffering from schizophrenia and anxiety disorder.  (R. 677).  Her current GAF score was 30.

18

(*Id*.)  Nowhere in Dr. Bland's notes does she indicate that Cheshire is non-compliant with her medication or her treatment.  Although it is apparent that Dr. Bland is Cheshire's treating psychiatrist, the ALJ makes no reference to her at all.

The law is well-settled; the opinion of a claimant's treating physician must be accorded substantial weight unless good cause exists for not doing so.  *Jones v. Bowen,* 810 F.2d 1001, 1005 (11th Cir. 1986).  The ALJ must articulate the weight given to a treating physician's opinion and must articulate any reasons for discounting the opinion.  *Schnorr v. Bowen*, 816 F.2d 578, 581 (11th Cir. 1987).  The mere fact that the ALJ failed to even consider Dr. Bland's treatment of Cheshire is sufficient to require this case to be remanded for further proceedings.  The ALJ does not explain why she fails to credit Dr. Bland's medical evidence nor does she give any reasons for discounting her.  The ALJ's failure to mention Dr. Bland, let alone articulate reasons for disregarding her, is reversible error.  *Broughton v. Heckler,* 776 F.2d 960, 961 (11th Cir. 1985).

For these reasons, the court concludes that the Commissioner erred as a matter of law, and that the case should be remanded for further proceedings.  In this case, it is clear that the ALJ failed to fulfill her responsibilities with respect to evaluating all the medical evidence of record and in failing to develop the record.  Thus, the court is unable to determine whether the ALJ's residual functional capacity determination is supported by substantial evidence, and doubt is necessarily cast upon the ALJ's conclusion that the plaintiff is not disabled. The court concludes that the ALJ's determination that Cheshire has the residual functional ability

19

to perform work is not supported by substantial evidence.

## V.  Conclusion

Accordingly,  this case  will be reversed and remanded to the Commissioner for further proceedings consistent with this opinion.  It is further

ORDERED that, in accordance with *Bergen v. Comm'r of Soc. Sec.*, 454 F.3d 1273, 1278 fn. 2 (11th Cir. 2006), the plaintiff shall have sixty (60) days after she receives notice of any amount of past due benefits awarded to seek attorney's fees under 42 U.S.C. § 406(b). *See also Blitch v. Astrue*, 261 Fed. Appx. 241, 242 fn.1 (11th Cir. 2008).  A separate final judgment will be entered.

A separate order will be entered.

Done this 14th day of November, 2013.

        /s/Charles S. Coody
CHARLES S. COODY
UNITED STATES MAGISTRATE JUDGE